IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALEXIS W. CLANTON,                          )
                                            )
              Plaintiff-Claimant,           )
                                            )         No. 10 C 4273
       v.                                   )
                                            )         Jeffrey T. Gilbert
MICHAEL J. ASTRUE, Commissioner             )         Magistrate Judge
of Social Security,                         )
                                            )
              Defendant-Respondent.         )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for summary judgment

[Dkt.##18, 26]. Claimant Alexis W. Clanton ("Claimant") brings this action under 42 U.S.C. §

405(g), seeking review of the decision by Respondent Michael J. Astrue, Commissioner of

Social Security ("Commissioner"), in which the Commissioner determined that Claimant's

eligibility for supplemental security income on the basis of disability ("SSID") had ceased.

Claimant raises the following issues: (1) whether the ALJ elicited a knowing waiver of the right

of representation; (2) whether the ALJ developed a full and fair record; (3) whether the ALJ

properly weighed the medical opinions and evidence in determining Claimant's residual

functional capacity; (4) whether the ALJ should have solicited further medical evidence; (5)

whether the ALJ properly analyzed Claimant's credibility; and (6) whether the ALJ erred in

relying upon the vocational expert's testimony regarding the availability of work in the national

economy that Claimant is capable of performing. For the reasons explained in this

Memorandum Opinion and Order, Claimant's motion for summary judgment is denied, the

Commissioner's cross-motion for summary judgment is granted, and the decision of the Commissioner of Social Security is affirmed.

## I. BACKGROUND

A.    **Procedural History**

Claimant is a 23 year old woman who first received SSID as a child, based upon a diagnosis of asthma. R. 25. Claimant initially filed for SSID at the age of six on June 5, 1994. R. 25, 50. Because her asthma met the requirements of listing section 103.03B, the Social Security Administration ("SSA") found her disabled, effective June 1, 1994. R. 25, 61.

Nine years later, in January 2003, Claimant's SSID was discontinued after her disability was found to have ceased due to medical improvement. R. 61-65. Following an appeal to the Administrative Law Judge ("ALJ") level, Claimant's SSID was reinstated when she was found to be disabled due to a growth impairment that met the requirements of listing section 100.02A. R. 526-28.

When Claimant turned 18 years old on July 15, 2005, her disability status was subjected to redetermination under the rules of disability used for adults, pursuant to section 1614(a)(3)(H) of the Social Security Act. R. 25, 529. The SSA determined that Claimant failed to meet the disability standard applicable to adults and her disability was found to have ceased effective March 1, 2006. R. 521. Claimant then filed a request for reconsideration, which the SSA denied on May 16, 2007. R. 534, 550-58. Shortly thereafter, Claimant requested a hearing before an ALJ. R. 562-63.

On September 4, 2007, Administrative Law Judge Robert Karmgard presided over a hearing at which Claimant appeared without an attorney, but was accompanied by her mother. R. 25, 1205-22. This hearing was adjourned to allow time for Claimant to secure representation.

2

R. 1211. On October 15, 2008, ALJ Karmgard reconvened the hearing, at which Claimant again appeared without an attorney and again was accompanied by her mother. R. 1224-58. At that time, Claimant acknowledged that she was ready to proceed with the hearing. R. 1226. Claimant and William Newman, a vocational expert, testified at the hearing. R. 1224. No medical expert testified in person. On November 5, 2008, the ALJ rendered a decision finding that Claimant no longer was disabled under the Social Security Act. R. 25-33. Specifically, the ALJ found Claimant had the "residual functional capacity to perform a reduced range of sedentary work," and that "the claimant was able to perform a significant number of jobs in the national economy." R. 28, 32.

Claimant then filed for review of the ALJ's decision before the Appeals Council. R. 11. On May 14, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 11-13. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

**B.     Hearing Testimony – October 15, 2008**

**1.     Claimant Alexis Clanton**

At the time of the hearing, Claimant was a 21 year old single mother, residing with her sister, mother, and 11 month old child. R. 1233. Claimant completed education through the 12th grade and had no past relevant work experience. R. 1233, 29, 32.

Claimant testified to an on-going struggle with asthma that prevents her from working. R. 1235-49. Claimant explained that since March 2006, she experiences episodes of wheezing and shortness of breath approximately two to three times per week. R. 1235, 1243, 29. Because of her asthma symptoms, Claimant stated that she uses an Albuterol inhaler about twice every week. R. 1234. Claimant also stated that once every week, her symptoms do not respond to the

inhaler. R. 1244. On these occasions, Claimant employs a home nebulizer. R. 1243. Claimant also stated that her symptoms are exacerbated by exertion, environmental irritants, and weather changes. R. 1235-36, 1242. Claimant further related that she sometimes suffers asthma attacks that require emergency room treatment. R. 1245-46. Claimant reported two such incidents in 2008 and stated that on both occasions she was prescribed tapering doses of prednisone. *Id.* Claimant also recalled two similar incidents in 2007 and one in 2006. R. 1245. She recalled that each of those incidents also resulted in an emergency room visit and a prescription for tapering doses of prednisone. R. 1245-46. Claimant also testified that on one occasion in 2006, her doctor administered a nebulizer treatment to her in his office. R. 1246.

Claimant testified that before she became pregnant in early 2007, she was able to play basketball, babysit her nephew, wash dishes, make beds, shop, vacuum, and sweep. R. 1237-39. However, Claimant also stated that, on occasion, such activities would trigger wheezing episodes. R. 1239. Additionally, she explained that she quit playing basketball because she had once overexerted herself while playing, triggering an asthma attack. R. 1239.

Claimant reported that since her daughter's birth, she spends most of her time feeding, changing, and bathing the child. R. 1240. She also continues to do the shopping for her household. R. 1241. However, she testified that she sometimes becomes short of breath when carrying the baby—who weighs approximately 25 pounds, according to Claimant—up stairs. R. 1240, 1249. Furthermore, she stated that she usually must take breaks from such activity every 15 to 20 minutes. R. 1241.

Though unsure as to how much weight she can lift, Claimant testified that she is able to carry her 11 month old baby and could probably lift a box. R. 1249. She estimated that she can stand for about 15 to 20 minutes before experiencing back pain, but does not have any difficulty

with sitting. R. 1248. She stated that she could probably walk half a mile (or for about half an hour) before beginning to struggle with wheezing, *id.*, and could run for about a block and a half before having to stop. R. 1242.

Claimant has also struggled with obesity since childhood. R. 654. In June 2002, Claimant weighed 251 pounds and had a body mass index ("BMI") of 47.4, which is categorized as obese. *Id.* In March 2006, Claimant's weight had increased to 278 pounds. R. 697. By January of 2007, Claimant's weight had decreased slightly to around 250 pounds. R. 699. At the time of her hearing in 2008, Claimant reported weighing about 250 pounds and stated that she had been near that weight since 2006. R. 1235. Throughout this period, Claimant was between 5' and 5'1" inches tall. R. 1234, 700.

### 2.    Vocational Expert William Newman

William Newman testified as a vocational expert ("VE"). R. 1249. The ALJ asked the VE what type of work, if any, a 21 year old person with a high school education and the same work history as Claimant (*i.e.*, none) could perform in Chicago and the metropolitan area, with the following limitations: lifting and carrying no more than 20 pounds occasionally and 10 pounds frequently; sitting, standing, or walking with normal breaks for no more than six hours in an eight-hour workday; inability to climb ladders, ropes, or scaffolds; occasional ability to climb ramps or stairs and balance, stoop, kneel, crouch, or crawl; inability to encounter any fumes, odors, dust, gases, smoke, molds, pollens, or other pulmonary irritants. R. 1252-53. The VE testified that a hypothetical individual with such limitations could perform multiple positions, including that of cashier, cafeteria attendant, and packager. R. 1253.

The ALJ then asked a follow-up question in which he proposed the same hypothetical and included the following additional restrictions: lifting and carrying no more than 10 pounds

occasionally and lighter items frequently, standing and walking with normal breaks for no more than two combined hours in an eight-hour day, and for no more than 15 continuous minutes at a time. R. 1255-56. The VE responded that such restrictions would eliminate the light work positions, but that the hypothetical individual would still be capable of performing sedentary positions—such as assembler and sorter. R. 1256. In order to offer a conservative estimate that accounted for the hypothetical individual's need to avoid pulmonary irritants, the VE then suggested a 30 percent reduction of the number of such positions available in the area. R. 1254-55.

Finally, the ALJ asked whether any positions would be available if the hypothetical individual could not sustain any work activities, including lifting, carrying, sitting, standing, and walking, for a combined total of at least six hours per day. R. 1256. The VE responded that such limitation would eliminate all jobs. *Id.*

## C. Medical Evidence

### 1. Evanston Hospital Records

Claimant has received repeated medical attention at Evanston Hospital since 2003. Her primary documented complaint is asthma exacerbation. Claimant also has sought treatment for other issues, including eczema, hemorrhoids, and chlamydia. R. 650-94.

On March 3, 2006, Claimant presented at the emergency room ("ER") complaining of wheezing that did not respond to her Albuterol inhaler. R. 655. She was found not to be in respiratory distress and was discharged on the same day with a prescription for tapering doses of prednisone over the next four days. R. 655-59. She also was instructed to use a home nebulizer every four to six hours. R. 659. The hospital records for this visit indicate a long history of asthma exacerbation, documenting the following incidents: (1) an ER visit in September 2003,

with a prescription for tapering prednisone doses, (2) a mild exacerbation in November 2003, for

which Claimant was seen in a doctor's office and prescribed tapering prednisone doses, (3) an

ER visit in March 2004, and (4) a hospitalization for asthma in May 2004. R. 656. Earlier

records indicate another hospitalization in December 2004. R. 661.

On February 27, 2006, Claimant was diagnosed with chlamydia. R. 667. On September

6, 2006, Claimant presented at the ER complaining of a rash on her right thumb. R. 671. Upon

examination, her lungs appeared clear. R. 674. Claimant was diagnosed with eczema and was

discharged. R. 671, 675. She was prescribed a topical cream for treatment. R. 675. On

November 6, 2005, Claimant presented at the ER complaining of rectal pain. R. 686. She was

diagnosed with hemorrhoids and discharged with instructions for symptomatic care. R. 686,

690.

### 2. Lutheran General Hospital Records

Claimant presented at Lutheran General Hospital's emergency room ("ER") on

September 20, 2005, complaining of an asthma exacerbation. R. 646. Her respiration was found

to be normal, and her lungs appeared to be clear. R. 649. She was prescribed prednisone. *Id.*

### 3. Dr. Amishi Desai, M.D.

On December 4, 2006, Dr. Amishi Desai completed a respiratory report in which he

diagnosed Claimant's condition as asthma. R. 695-96. At the time of the report, he had not seen

Claimant since February 27, 2006. R. 695. Dr. Desai indicated that Claimant's breath sounds

had been normal at that time, and that pulmonary function testing from January 6, 2005 had

demonstrated a forced vital capacity ("FVC") of 1.93 and a forced expiratory volume ("FEV") of

1.15. *Id.* He also stated that Claimant had suffered three asthma exacerbations between

February and December 2006, citing two hospitalizations during this time—one on March 3,

2006 and another on March 7, 2006. R. 696. Dr. Desai stated that the duration of each attack was approximately one to two days and noted that Claimant experienced mild wheezing between attacks. *Id.* Dr. Desai felt that Claimant was capable of performing work-related activities such as sitting, standing, lifting, and carrying, but he recommended avoidance of prolonged exertive exercise. *Id.*

### 4. Dr. Scott A. Kale, M.D. – State Examining Physician

Claimant had a consultative examination on January 4, 2007. Pulmonary function testing performed at this time revealed "mild obstruction" that significantly improved upon treatment. R. 699. Claimant's FVC was listed as 2.82 prior to medication and 3.24 after medication. R. 703, 714. Claimant's FEV was listed as 2.17 prior to medication and 2.57 after medication. R. 703, 714. Dr. Kale noted Claimant's history of asthma and indicated that her last hospitalization had occurred approximately a year prior to the examination. R. 700. Claimant complained of intermittent shortness of breath, influenced by changes in weather and exertion. *Id.* Claimant's lungs were clear and the other physical examination findings were essentially normal. R. 700-01. Dr. Kale described Claimant as "polite, pleasant and cooperative" and noted that she was able to relate a coherent medical history without cognitive difficulty. R. 701.

### 5. Residual Functional Capacity ("RFC") Assessments

A state agency reviewing physician assessed Claimant's RFC on January 18, 2007. R. 707. The physician indicated that Claimant could occasionally lift or carry 20 pounds, could frequently carry 10 pounds, and could stand or walk with normal breaks for a total of six hours in an eight-hour workday. R. 708. The reviewing physician also determined that Claimant could sit for a total of six hours a day and should avoid concentrated exposure to fumes, odors, dusts, and gases. R. 708-11. Claimant's weight was recorded as 250 pounds. R. 714. The physician

commented that Claimant's asthma currently was "under good control" and deemed her capable of significant gainful activity ("SGA"). These findings reflected the limitations previously set forth in a March 21, 2006 RFC assessment. R. 725-32. This previous RFC also recorded Claimant's weight as 250 pounds and noted that there were no complications due to obesity. R. 732.

### 6. Evanston Hospital Outpatient Clinic

Claimant was treated at the Evanston Hospital Outpatient Clinic on several occasions in 2007. On March 17, 2007, Claimant presented at the ER complaining of abdominal pain. R. 763. Claimant was reported to be six or seven weeks pregnant and was treated for a urinary tract infection. R. 763-64, 953. Her lungs were examined and found to be clear. R. 763. Her asthma was described as well-controlled. R. 946. On April 16, 2007, Claimant presented for supervision of her pregnancy. R. 782. At this time, she was also diagnosed with an asthma exacerbation, but no treatment notes were provided. *Id.* On April 19, 2007, Claimant presented again for supervision of her pregnancy, and her blood pressure was elevated. R. 785, 975-76.

On May 1, 2007, Claimant experienced an asthma exacerbation. R. 811. Same day pulmonary function testing revealed Claimant's FVC to be 3.18 and her FEV to be 2.62. R. 810-11, 1003. On May 23, 2007, Claimant presented at the ER complaining of nausea. R. 818. She was discharged in good condition on the following day. R. 824. On August 10, 2007, Claimant arrived at the ER after being kicked and punched in the stomach during an altercation with family members. R. 832. She was discharged the next day. R. 834, 1026, 1030.

On October 18, 2007, Claimant was hospitalized after suffering an acute asthma attack induced by an upper respiratory infection. R. 858-60, 1057. At the time, Claimant reported that she was using an Albuterol inhaler two to four times per week and had once employed a home

9

nebulizer two months prior to admission. R. 861. She experienced shortness of breath upon admission, and a chest examination revealed bilateral wheezing. R. 861, 863. However, her symptoms improved significantly over the course of her stay and with the application of a four-day prednisone treatment. R. 865, 1063, 1095. At this time, Claimant also tested positive for marijuana use. *Id.* Claimant was discharged on October 22, 2007, with a tapering dose of prednisone and instructions to use her Albuterol inhaler as needed. R. 1089, 1095, 1096.

At the time of this attack, the pulmonary resident, Dr. Ariel Polish, submitted a report regarding Claimant's condition. R. 1063. His report contradicted Claimant's statements, indicating that Claimant only needed her inhaler three times in the past few months and used her nebulizer twice in the past month. R. 1192. Dr. Polish also noted that Claimant's "severe asthma . . . would likely make it difficult for her to work full-time." R. 1077. The record of this asthma attack was later reviewed by Dr. Daniel Ray, a pulmonary specialist. R. 1192. Dr. Ray reviewed the record, examined Claimant, and stated that Claimant had severe persistent asthma that required the use of multiple medications but remained vulnerable to exacerbation despite the use of such medications. R. 1191.

On November 2 and 3, 2007, Claimant presented with possible labor onset. R. 878-89. On November 2, 2007, her asthma was reported to be stable and she exhibited no wheezing. R. 879, 1110. Claimant delivered her daughter on November 5, 2007. R. 896, 901. During labor, she was given stress dose steroids. She also experienced moderate wheezing, which was treated with nebulizer treatments every four hours. R. 898-99, 1155.

### 7.     Miscellaneous – American Lung Association Asthma Action Plan

In late 2008, Claimant was assigned an "asthma action plan" for managing her condition. R. 1190. This plan categorized her asthma as "mild persistent" and noted that it was triggered by

colds, exercise, smoke, air pollution, dust, mold, and weather changes. *Id.* It further indicated

that Claimant should take two puffs from her Albuterol inhaler 20 minutes before exercising. *Id.*

Finally, the plan suggested that if Claimant was experiencing severe problems with breathing,

she should supplement the use of her inhaler with 60 milligrams of prednisone. *Id.*

**D.     The ALJ's Decision – November 5, 2008**

Following a hearing and a review of the medical evidence, the ALJ determined that

Claimant's disability ended on March 1, 2006 and that she had not become disabled again since

that date. R. 33. The ALJ subjected Claimant's disability to redetermination under the required

five-step sequential analysis. R. 26. Step one is not used for the purposes of re-determining

disability. *Id.* At step two, the ALJ found that Claimant had two severe impairments: asthma

and obesity. R. 28. At step three, the ALJ found that Claimant has not had an impairment that

meets or medically equals one of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1

since March 1, 2006. *Id.* Step four was not performed because Claimant has no past relevant

work history. R. 32. At step five, the ALJ found Claimant capable of performing a reduced

range of sedentary work as defined in 20 C.F.R. 416.967(a). R. 28.

In evaluating step three, the ALJ found that Claimant's asthma, though a severe

impairment, did not meet the requirements of either section 3.02A/B or section 3.03B. *Id.*

Under section 3.02A/B, an individual between 61 and 63 inches tall must exhibit, for a 12 month

consecutive period, either a FEV of 1.15 or less or a FVC of 1.35 or less. *Id.* In January 2005,

Dr. Desai reported that Claimant had a FVC of 1.93 and a FEV of 1.15. R. 695. In January

2007, pulmonary function testing revealed a FVC of 2.82 prior to medication and of a FVC of

3.24 after medication. It also revealed a FEV of 2.17 prior to medication and a FEV of 2.57 after

medication. R. 703, 714. On May 1, 2007, Claimant's FVC was 3.18, and her FEV was 2.62.

R. 810-11. Although one of the readings from January 2005 did meet the listed requirement, the ALJ found no indication that FEV readings at or below this level of severity persisted for any continuous 12 month period. R. 31. Additionally, this reading was taken in the time period before that relevant to the disability redetermination. Using these figures, the ALJ concluded that Claimant's pulmonary function testing did not approach listing level severity. R. 28.

Under section 3.03B, attacks must occur at least once every two months, with a hospitalization for longer than 24 hours counting as two attacks. *Id.* Alternatively, attacks occurring six times within any 12 month consecutive period will qualify. *Id.* Claimant experienced two attacks in 2006 and three in 2007. One of her 2007 attacks required a five-day hospitalization and, therefore, counted as two attacks. Considering this, the ALJ found that the frequency of Claimant's attacks did not satisfy the listed requirement. R. 28.

In determining Claimant's RFC, the ALJ gave weight to all of the relevant evidence, including Claimant's testimony and the state agency reviewing physician's RFC assessments. R. 29-32. In response to Claimant's testimony that her asthma made it difficult for her to stand for longer than 15 or 20 minutes without rest, the ALJ limited Claimant's RFC to the performance of sedentary work, rejecting the RFC assessments' indication of an ability to perform light work.[1]
*Id.*

In evaluating step five, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that her statements regarding the "intensity, persistence, and limiting effects of [those] symptoms [were] not credible to the extent they [were] inconsistent with the residual functional capacity

---

[1] Sedentary work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools," while light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds," and a job in the light work category "requires a good deal of walking or standing." 20 C.F.R. § 404.1567(a), (b).

assessment." R. 30. In fact, Claimant's testimony regarding her symptoms was in no way

inconsistent with the RFC's determination, as she indicated that her symptoms did not prevent

her from sitting, testified that she could stand for at least 15 minutes before requiring a break,

and reported that although she had trouble carrying her 25 pound baby up stairs, she could

probably lift a box. R. 1248-49. The ALJ also deemed the VE to be credible, accepting his

testimony as to the number of sedentary jobs available in Chicago and the metropolitan area. R.

33. Because the ALJ found Claimant capable of performing a reduced range of sedentary work,

he concluded that Claimant's disability had ceased on March 1, 2006. *Id.*

## II. LEGAL STANDARD

### A. Standard Of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes

the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v.*

*Apfel*, 530 U.S. 103, 106-07 (2000). Under such circumstances, the district court reviews the

decision of the ALJ. *Id.* Judicial review is limited to determining whether the decision is

supported by substantial evidence in the record and whether the ALJ applied the correct legal

standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere

scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Even

when there is adequate evidence in the record to support the decision, however, the findings will

not be upheld if the ALJ does not "build an accurate and logical bridge between the evidence and

the result." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). If the Commissioner's decision

lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct standards and whether there is substantial evidence to support the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.     Disability Standard**

Disability insurance benefits are available to a claimant who can establish that she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. 404.1520(a)(4)(i-v). Under this process, the ALJ must inquire, in the following order: (1)

whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or medically equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once a claimant has proven she cannot continue her past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

Claimant raises the following issues in support of her motion for summary judgment: (1) whether the ALJ elicited a knowing waiver of the right of representation; (2) whether the ALJ fully developed the record; (3) whether the ALJ properly weighed the medical opinions and evidence in determining Claimant's RFC; (4) whether the ALJ should have solicited further medical evidence; (5) whether the ALJ properly analyzed Claimant's credibility; and (6) whether the ALJ erred in relying upon the VE's testimony regarding the availability in the national economy of work which Claimant is capable of performing.

### A.     Claimant Did Not Knowingly Waive Her Right Of Representation

A claimant has a statutory right to be represented by counsel at a disability hearing. 42 U.S.C. § 406(c); 20 C.F.R. § 416.1500; *see also Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994); *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th Cir. 1991). However, a claimant may waive this right "if given sufficient information to enable [her] to intelligently decide whether to retain counsel or proceed *pro se.*" *Hawwat v. Heckler*, 608 F. Supp. 106, 108 (N.D. Ill. 1984). In the Seventh Circuit, a valid waiver is secured only where the ALJ informs the claimant of (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or

a contingency arrangement, and (3) the limitation on attorney's fees to 25 percent of past-due

benefits with required court approval of the fees. *Binion*, 13 F.3d at 245 (citing *Thompson v.*

*Sullivan*, 933 F.2d at 584).[2] In *Thompson*, the court found an invalid waiver where the claimant

received a prehearing notice that met the first two requirements but provided only indecipherable

information about the 25 percent fee limitation. 933 F.2d at 584. Likewise, in *Binion*, the court

found an invalid waiver where the ALJ "did not adequately explain the 25 percent cap on fees."

13 F.3d at 245.

Here, Claimant argues that the ALJ did not elicit a knowing waiver because, although he

initially informed her of her right to representation at the first hearing in September 2007, he did

not reiterate the benefits of legal assistance or the availability of free counsel at the continuation

of the hearing in October 2008. Claimant's Br. [Dkt.#18], at 5. The Commissioner argues that

there is no duty to re-inform claimants of the right to representation, and maintains that the ALJ

provided Claimant with sufficient information at the initial hearing. Commissioner's Br.

[Dkt.#26], at 3. Neither party, however, raises the most salient issue, which is the effect upon

the knowing waiver analysis of the ALJ's failure to inform Claimant of the 25 percent attorney's

fees limitation as required by the Seventh Circuit either at the first hearing convened in

September 2007 or the second hearing in October 2008.

---

[2] 42 U.S.C. § 406(c) contains a notice requirement which provides that "the Commissioner of Social
Security shall notify each claimant in writing, together with the notice to such claimant of an adverse
determination, of the options for obtaining attorneys to represent individuals in presenting their cases
before the Commissioner of Social Security." It also requires that "such notification . . . advise the
claimant of the availability to qualifying claimants of legal services organizations which provide legal
services free of charge." Another judge in this district has recently noted that this statutory requirement is
narrower than the test mandated by *Binion* and *Thompson*—requiring, essentially, that only the first two
elements be met, and providing that the disclosure can be made in a writing appended to a notification of
an adverse determination, rather than being expressly delivered by the ALJ himself. *See Smith v. Astrue*,
No. 10 C 2789, 2011 WL 2470877 at *7 (N.D. Ill. June 21, 2011). The Seventh Circuit standard is a
judicially-determined test which may have been abrogated by the statutory requirement. However, since
*Binion* reaffirmed the *Thompson* test two-and-a-half years after the relevant statute went into effect, a
knowing waiver in the Seventh Circuit must still satisfy the *Binion/Thompson* test.

On May 22, 2007, Claimant requested a hearing before an ALJ on the issue of her disability. R. 562-63. At that time, her mother signed, in her stead, a request form stating that she understood that she had a right to representation and acknowledging that the Social Security office would provide her with a list of legal referral organizations if she so desired. R. 562. On August 15, 2007, Claimant was sent a Notice of Hearing. This notice indicated that if she wanted a representative, she should get one immediately. R. 577-74. At her initial hearing on September 4, 2007, the ALJ informed her that she had a right to be represented by an attorney, detailed the existence of "various legal aid societies that can represent you free of charge," and listed some of the benefits of obtaining counsel—including the fact that counsel can assist in making legal arguments, call and question additional witnesses, and cross-examine any witnesses called by the Commissioner. R. 1209-10. Claimant stated that she understood her rights but claimed not to have received the list of referral organizations that was supposed to have been mailed with her Notice of Hearing. R. 1211. She also stated that she wanted time to secure representation. *Id.* The ALJ indicated that he would provide her with another list and adjourned the hearing to give her time to secure counsel. R. 1209, 1211, 1221.

On September 18, 2008, Claimant was sent another Notice of Hearing, informing her of the time and place where her September 2007 hearing would be continued. The Notice again indicated only that if Claimant wanted representation, she should secure it. R. 592. Claimant signed an acknowledgment of the receipt of this Notice on September 25, 2008. R. 34. When Claimant appeared at the second hearing in October 15, 2008, she stated that she had attempted to secure representation, had not been able to do so, and was ready to proceed with the case. R. 1226. On November 5, 2008, Claimant was informed of the ALJ hearing's unfavorable decision. The letter sent to her at that time, after the hearing, finally informed her of the 25 percent

17

attorneys' fee limitation: "if you hire a lawyer . . . we will withhold up to 25 percent of any past-due benefits to pay toward the fee." R. 23.

On at least one occasion, Claimant received information sufficient to satisfy the first two elements required by *Thompson* and *Binion*. At the initial September 4, 2007 hearing, the ALJ informed Claimant of the manner in which an attorney could aid in the proceedings and indicated the availability of free counsel. However, Claimant never was informed, either before or during her ALJ hearing, of the 25 percent fee limitation. Rather, she only received notice of this fact after the hearing, in the context of appeal. Thus, Claimant's waiver is invalid under the Seventh Circuit standard. That, however, is not the end of the analysis in the Seventh Circuit.

**B.     The ALJ Developed A Full And Fair Record**

An invalid waiver does not entitle a claimant to remand unless the ALJ failed to develop a full and fair record. *Binion*, 13 F.3d at 245. The ALJ has a duty to develop a full and fair record in all cases. *Hawwat*, 608 F. Supp. at 109. However, this duty is heightened when the claimant proceeds without counsel. *Id.* This heightened duty requires the ALJ to "scrupulously and conscientiously . . . probe into, inquire of, and explore for all relevant facts." *Nelms*, 553 F.3d at 1098 (quoting *Smith v. Sec'y of Health, Educ., & Welfare*, 587 F.2d 857, 860 (7th Cir. 1978)). Although the ALJ is required to "supplement the record by . . . asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records," courts typically defer to the ALJ's judgment unless there has been a "significant omission." *Nelms*, 445 F.3d at 1098. A significant omission is one that is prejudicial to the claimant. *Id.* To demonstrate prejudice, a claimant must "set forth specific, relevant facts—such as medical evidence—that the ALJ did not consider," and "mere conjecture . . . is insufficient." *Id.*

Here, Claimant argues that the ALJ failed to develop a full and fair record by (1) failing

to take any testimony from Claimant's mother regarding Claimant's limitations and impairments,

and (2) failing to probe the possibility that Claimant suffered from a mental impairment, as

allegedly indicated by assessments done when Claimant was in grade school and disability

hearing reports from 2003 and 2005. Claimant's Br. [Dkt.#18], at 4-7.

1.    **The ALJ's Decision Not To Question Claimant's Mother Does Not Amount**
      **To A Significant Omission**

Claimant relies upon *Simien v. Astrue*, No. 06-5153, 2007 WL 1847205 (10th Cir. June

28, 2007), for her contention that the ALJ's duty to develop a full and fair record required him to

question her mother. In that case, the court concluded that an ALJ had failed to develop the

record when he conducted a very brief hearing at which the testimony given by a minor claimant

and his mother comprised only five pages in total. *Simien*, at *3. The court found that the

minor's mother was incapable of "articulating the effects of [her son's] medical problems"

without assistance from the ALJ—and she received none, as the ALJ in that case entirely failed

to inquire about the claimant's daily activities or difficulties. *Id.* Additionally, in that case, there

were five years of relevant medical documents missing from the record. *Id.*

In this case, Claimant's ALJ hearing suffered from no such deficiencies. At the time of

the hearing, Claimant was a 21 year old adult with a child. Her mother accompanied her to the

hearing at which Claimant testified as a witness. R. 1205. The ALJ conducted a 42 minute

hearing at which he extensively questioned Claimant about her impairments, eliciting 17 pages

of testimony. R. 1233-1249. Unlike the minor in *Simien*, Claimant could have been expected to

advocate for herself—and she did so, cogently answering questions about her daily activities and

the impact of her impairments upon her ability to work. Because the ALJ questioned Claimant at

length about her impairments and ultimately credited her answers in his RFC determination, his

19

failure to question her mother regarding those same impairments does not constitute a significant omission.

## 2. The ALJ Was Not Required To Probe A Possible Mental Impairment

Claimant also argues that the ALJ failed to develop the record by declining to probe the possibility that Claimant suffered from a mental impairment, something Claimant expects the ALJ to have inferred from a reading of grade-school assessments and several disability reports from 2003 and 2005. Claimant's Br. [Dkt.#18], at 5-7. Claimant relies for this contention upon (1) a general argument that the presence in the record of such assessments imposed upon the ALJ a duty to inquire into Claimant's educational background, and (2) a misreading of the record by which Claimant suggests that she communicated a potential mental impairment to the ALJ when she told him that she was only able to read and write "certain things, not everything." Claimant's Br. [Dkt.#18], at 7.

The latter premise clearly is overcome by a proper reading of the record. The ALJ began the 2008 hearing by asking Claimant—who indicated that she had graduated from high school in 2006—if she could read and write the English language. R. 1234. Claimant responded by saying "yes." *Id.* The ALJ then said that Claimant would "have to speak up" because he had "a fan overhead" and consequently was able to hear only "certain things, not everything" that was said. *Id.* Thus, Claimant never stated that she could read and write only "certain things." Instead, the ALJ asked Claimant to speak up because he had heard only "certain things" that she had said. Indeed, a correct reading of the record indicates that rather than alerting the ALJ to a possible mental impairment, Claimant's answers to the ALJ's questions about her education actually accomplished the opposite—establishing that she could read and write, add, subtract,

multiply, and calculate proper change in dollars and cents. If anything, Claimant's responses to these questions indicate that the ALJ had no reason to probe a mental impairment.

Any other evidence of a mental impairment is both dated and tenuous at best, and Claimant's suggestion that it should have prompted the ALJ to perform the designated procedure for evaluating mental impairments when they actually are *claimed as disabilities* amounts to nothing more than a mere conjecture of prejudice.

Claimant points to both grade-school assessments and recent disability hearing reports as demonstration of her alleged mental impairment. Claimant's Br. [Dkt.#18], at 6-7. The grade school assessments, primarily from the early 1990s, undoubtedly are dated and irrelevant to the disability determination in 2008. However, even if credited, they do not support any suggestion of an actual mental impairment.

In a diagnostic report from 1993, a speech pathologist noted that the then-five year old Claimant had a "moderate to severe problem in language." R. 323. On the basis of this report, Claimant was admitted to the speech pathology program, in which she received special education in this area. R. 323, 329, 330. A psychological report from the same year placed Claimant in the low average range of intellectual functioning but also concluded that Claimant would be able to do the basic academic tasks expected at her educational level. R. 333. Then, in 1999, on a childhood function report submitted to the SSA, Claimant's mother indicated that Claimant no longer received any additional educational therapy (including speech therapy). R. 435. At the same time, a School Activities Questionnaire, apparently submitted by Claimant's teacher, indicated that Claimant was not enrolled in special education, did very well in school, had no problems with attention span, concentration, or on-task behavior, and was improving in basic math skills. R. 436. The only problem indicated was a failure to complete long-term reports on

time. *Id.* Thus, a close examination of the record reveals that the problems Claimant cites as grounds for investigating a mental impairment were ameliorated entirely nearly ten years before the instant ALJ hearing.

The more recent disability reports also provide no concrete indication of any mental impairment—further demonstrating that there was no reason for the ALJ to probe the issue. On a disability hearing report completed in 2003 (when claimant was 14 years old), Claimant's mother indicated that her daughter had recently been suspended from school for five days after experiencing "behavior problems" that seem to have been related to a discrete social interaction with "one girl in particular." R. 71, 76. She also stated that Claimant had been seeing a therapist for six months but recently had ceased doing so. R. 73, 78. Claimant's mother simultaneously reported that Claimant had the ability to read, write, speak, and understand English at an age-appropriate level and suggested that the reason Claimant was not get getting good grades was not because she "couldn't do the work," but because she was "letting other things interfere." R. 71, 84. The examining officer who considered this evidence (in order to determine whether Claimant's disability continued) ultimately concluded that Claimant did not have a "medically documented psychiatric impairment." R. 85. In 2005, after Claimant had achieved majority, Claimant's mother indicated on a disability report that Claimant never had been seen by a doctor, hospital, clinic, or anyone else regarding mental problems that would limit her ability to work. R. 609.

Examination of both the grade-school assessments and the recent disability reports demonstrates that there was no reason for the ALJ to probe the issue of a mental impairment. However, even if there had been, the ALJ's failure to probe this issue does not amount to a prejudicial omission because none of the available medical evidence suggests that there was any

such impairment. It is also significant that Claimant, now represented by counsel, has submitted no additional documentation of her supposed mental impairment. Since Claimant presents no specific facts or additional medical evidence that the ALJ did not consider, her argument that he should have probed for the existence of a mental impairment is mere conjecture and does not demonstrate a failure to develop the record.

## C.    The ALJ Properly Weighed The Medical Opinions And Evidence

The ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. Claimant argues that the ALJ improperly weighed the medical evidence and opinions in the following ways: (1) he did not consider Claimant's growth impairment; (2) he did not consider the combined effect of all of Claimant's impairments in that he (a) failed to discuss her potential problems with concentration, persistence, and pace, (b) failed to discuss the effect of her obesity and its potential symptom of fatigue, and (c) failed to discuss the potential limitations imposed by her likelihood of being off-pace or absent; and (3) he did not give sufficient weight to the opinion of Dr. Daniel Ray. Claimant's Br. [Dkt.#18], at 8-13.

### 1.    The ALJ Reasonably Considered Claimant's Height

Claimant contends that the growth impairment by which she was found to be disabled in 2004 (under the standard for children) persisted as a severe impairment into adulthood and, therefore, should have been considered by the ALJ in his determination of her RFC under the adult standard. Claimant's Br. [Dkt.#18], at 8. The Commissioner argues that there is no listing for a growth impairment at the adult level, and maintains that the ALJ was not required to consider this in his determination of Claimant's RFC. Commissioner's Br. [Dkt.#26], at 5.

Although Claimant recognizes that there is no growth impairment listing for adults, she argues that the problems stemming from her growth impairment continue to impact her ability to work and, as such, should have been considered by the ALJ. Claimant's Br. [Dkt.#18], at 8. Claimant's argument is unavailing in light of the application of listing 100.02A, under which her particular growth impairment fell. According to Pt. 404, Subpt. P, App. 1, this category of growth impairment is "considered to be related to an additional specific medically determinable impairment" and is accompanied by either (1) a fall of greater than 15 percentiles in height which is sustained or (2) a fall to, or persistence of, height below the third percentile. In 2004, an ALJ found Claimant's growth impairment to be related to her asthma: the high doses of steroids that she used to control her asthma had caused her to fall more than 15 percentiles in height. R. 527. Thus, it was not Claimant's actual stature that constituted her impairment. Rather, what amounted to an impairment was *the difference* between that stature and the normal projected height for a child of her age.

The distinction is brought into further relief with reference to *Warre v. Commissioner of Social Security Administration*, 439 F.3d 1001 (9th Cir. 2006), a case interpreting listing section 100.02A. In that case, the claimant had experienced a drop in height from the 50th to the 25th percentile. *Id.* at 1003. Because of this, he was found disabled under section 100.02A. Thereafter, his height remained stable at the 25th percentile, and his disability ceased due to medical improvement. *Id.* at 1004. On appeal, Claimant argued that he continued to be disabled because he "sustained a fall in height [that was] never recovered." *Id.* at 1005. The Commissioner argued that because the claimant's growth rate had ceased falling, he no longer met the listed requirement. *Id.* The court adopted the Commissioner's interpretation of section 100.02A, clarifying that a growth impairment under section 100.02A involves a "continuing

reduction in growth velocity," meaning "not merely that the child remains shorter in stature, but that his growth *rate* has slowed." *Id.* (emphasis in original).

With this interpretation in mind, the reason why there exists no comparable adult listing for Claimant is clear: the growth impairment of section 100.02A refers not to a person's ultimate stature, but to the relative loss that they experience from their potential stature because of another impairment during the time they are supposed to be growing. By the time an individual has reached his or her adult stature, growth velocity has fallen to zero, and the basis for any disability disappears. Understood in this way, Claimant's argument lacks basis. She is not disabled merely because she is shorter in stature. Moreover, although the ALJ properly declined to consider Claimant's previous growth impairment in his RFC determination, it cannot be said that he failed to take her ultimate stature into consideration. Indeed, the ALJ specifically asked Claimant how tall she was. R. 1234.

## 2.    The ALJ Reasonably Considered The Combined Effect Of All Impairments

In making the RFC determination, the ALJ must "consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The Claimant's impairments are those that she says she has and those about which the ALJ receives evidence. 20 C.F.R. § 404.1512(a); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004).

Claimant contends that the ALJ did not properly consider the combined effects of all of her impairments by (A) failing to discuss her potential mental problems with concentration, persistence, and pace, (B) failing to discuss the effect of her obesity and its potential symptom of fatigue, and (C) failing to discuss the potential limitations imposed by her likelihood of being off-pace or absent. Claimant's Br. [Dkt.#18], at 9-10, 13-14.

25

### 2(A). The ALJ Was Not Required To Consider Any Difficulties In Concentration, Persistence, Or Pace

Claimant argues that the ALJ failed to consider her potential difficulties with concentration, persistence, and pace. She relies for this contention upon *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), a recent case in which the Seventh Circuit reversed the district court's affirmance of a denial of benefits and remanded for reconsideration. In that case, the ALJ determined that the claimant, who had a documented medical history of depression, suffered difficulties in concentration, persistence, and pace. *Id.* at 617. He failed, however, to include those limitations when questioning the VE about the hypothetical person's ability to work. *Id.* Because ALJs are required to "orient the VE to the totality of the claimant's limitations," this omission proved fatal to the ALJ's disability determination. *Id.* at 619.

Claimant's argument is based upon two premises. First, Claimant suggests that had the ALJ properly considered her alleged mental impairment, he would have been required to orient the VE to her *potential* difficulties with concentration, persistence, and pace. Claimant's Br. [Dkt.#18], at 9-10. This suggestion fails on two accounts. In the first place, it requires the Court to suppose that the ALJ should have probed a mental impairment. Because, as explained above, the ALJ was neither required to probe a mental impairment nor likely to find one had he done so, this argument is unavailing. Second, even if the ALJ were required to consider a mental impairment, he only would have had to weigh, in his RFC determination, those difficulties in concentration, persistence, and pace that he deemed to be credible and that were "supported by medical evidence in the record"—not, in other words, any *potential* difficulties in this regard that possibly might have arisen. *Simila v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009).

The second premise upon which Claimant relies is the notion that her physical impairments—asthma and obesity—could produce difficulties in concentration, persistence, and

pace. Claimant's Br. [Dkt.#18], at 10. More specifically, Claimant suggests that obesity can lead to fatigue, which, in turn, can limit concentration, persistence, and pace. *Id.* Claimant further notes that fatigue appears more often in individuals who suffer from sleep apnea and argues that she may have suffered from this impairment. *Id.* However, under both *O'Connor-Spinner* and *Simila*, difficulties in concentration, persistence, and pace function as a measurement of *mental*, not physical, impairment. As previously discussed, in Claimant's case there is neither any significant medical evidence nor any testimony that a mental impairment existed—and the ALJ is not required to imply the existence of a mental impairment from the evidence of a physical impairment. Moreover, even if Claimant's chain of analysis (from obesity to sleep apnea to fatigue to difficulty with concentration, persistence, and pace) were followed, its anchor simply does not exist in the record: the only evidence directly addressing Claimant's alleged sleep apnea is a polysomnogram from 1999 that came back normal. R. 444.

Because there is no evidence that Claimant suffered from a mental impairment, the ALJ was not required to consider any difficulties in concentration, persistence, and pace.

### 2(B). The ALJ Reasonably Considered The Effect Of Claimant's Obesity

Claimant argues that the ALJ did not consider her obesity, particularly the effect that it would have on her asthma and her alleged mental impairment. Claimant's Br. [Dkt.#18], at 10. Because the argument that the ALJ should have probed a mental impairment already has been rejected, it will not be reconsidered here. Additionally, the ALJ did conclude that Claimant suffered from obesity. R. 28. Thus, the only question is whether the ALJ properly considered the combined effect of Claimant's obesity and asthma.

Under SSR 02-1p, the ALJ "should consider the effects of obesity together with the underlying impairments." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). However,

27

"failure to explicitly consider the effects of obesity may be harmless error." *Id.* In *Skarbek v. Barnhart*, 390 F.3d 500 (7th Cir. 2004), the court found that a failure to explicitly consider the effect of the claimant's obesity was harmless error where the ALJ adopted the limitations suggested by doctors who were aware of the impairment. 390 F.3d at 504.

This case is analogous to *Skarbek* in that the ALJ implicitly factored Claimant's obesity into his determination, rendering harmless any failure to consider it explicitly. Specifically, Claimant testified that she could not stand for longer than 15 or 20 minutes without her back hurting. R. 1248. This is not a symptom of her asthma; instead, it is related to her obesity. The ALJ included this limitation in his questioning of the VE, asking about the type of work that could be performed by an individual who could not stand or walk for more than 15 continuous minutes. R. 1255. He then adopted the same limitation in his final RFC determination. R. 28. Moreover, the ALJ relied upon medical evidence that specifically considered Claimant's obesity. Nearly all of Claimant's hospital records take note of her weight, and her weight during the relevant period (from 2006 onward) stayed around 250 pounds, as Claimant herself testified. R. 1234-35. Additionally, both RFC assessments noted that Claimant's weight was 250 pounds, and the latter assessment even explicitly stated that Claimant suffered no complications from obesity. R. 714, 732. Thus, in determining Claimant to be capable of only sedentary work— rather than light, as the RFC assessments suggested—the ALJ restricted Claimant's ultimate RFC to reflect the limitations about which she testified, implicitly relying on evidence about the effects of her obesity.

Finally, though Claimant notes that obesity may cause fatigue, which in turn may affect physical and mental functioning in the workplace, she fails to indicate any specific, relevant evidence that this was the situation in *her* case. Claimant's Br. [Dkt.#18], at 10. Because the

ALJ implicitly considered the limitations of Claimant's obesity, any failure to make explicit his conclusions about the combined effect of her asthma and obesity was harmless.

### 2(C). The ALJ Reasonably Considered Claimant's Likelihood Of Being Off-Pace Or Absent

Finally, Claimant argues that the ALJ did not consider the potential limitations imposed by her likelihood of being off-pace or absent from work. Claimant's Br. [Dkt.#18], at 13-14. Claimant relies for this contention upon two cases in which the claimants suffered from mental impairments: *Punzio v. Astrue*, 630 F.3d 704 (7th Cir. 2011) and *Terry*, 580 F.3d at 475. In *Punzio*, the claimant suffered from depression, dyslexia, and bi-polar disorder. 630 F.3d at 708. In *Terry*, the claimant suffered from depression and psycho-physiological pain. 580 F.3d at 473. In both cases, the claimants' mental impairments rendered their ability to work sporadic at best. Because those claimants were subject to illnesses with both "good days and bad days," the ALJ had to consider the extent to which their impairments would present a likelihood of either missing work or being off-pace some percentage of the time. *Terry*, 580 F.3d at 474. Moreover, the ALJ had to be sure to include those limitations in any questions he or she posed to the VE. *Id.* at 475.

In this case, however, Claimant does not suffer from a mental impairment. Instead, she suffers from a chronic physical impairment that does not manifest itself in off-pace performance or unpredictable absence. Thus, the ALJ was not required to consider any such contingencies. Additionally, Claimant's argument overlooks the fact that the ALJ's RFC determination actually did account for the particularities of her impairment. Claimant suggests that the RFC allowed for only normal breaks and failed to consider the possibility that someone with asthma would need more than normal breaks. Claimant's Br. [Dkt.#18], at 14. This simply is not the case. Instead, the ALJ restricted Claimant's RFC to work which required standing or walking for no more than

15 continuous minutes. R. 28. Therefore, although the ALJ was not required to consider any limitations imposed by Claimant's potential to be off-pace or absent, he did reasonably weigh the contingencies applicable in her case.

### 3. The ALJ Reasonably Weighed The Opinion Of Dr. Daniel Ray

Claimant further contends that the ALJ failed to give sufficient weight to an October 2007 report from Dr. Daniel Ray at the Evanston Hospital Outpatient Clinic. Claimant suggests that in determining that she is capable of sedentary work, the ALJ minimized the weight of this report by failing to take into account the limitations on her abilities which it *implied.* Claimant's Br. [Dkt.#18], at 12. Claimant describes Dr. Ray as a treating physician and suggests that the ALJ improperly rejected his opinion. *Id.*

In making a RFC determination, the ALJ must assign varying amounts of weight to different types of medical sources. *See Simila,* 573 F.3d at 514. Treating sources generally are entitled to greater weight than non-treating ones. *Id.* Specifically, a treating physician's opinion is entitled to controlling weight if it is supported by the medical findings and consistent with the other substantial evidence in the record. *Id.; see also* 20 C.F.R. § 404.1527(d)(2). By contrast, the ALJ need not assign controlling weight to the opinion of a non-treating source. *Simila,* 573 F.3d at 514. Rather, the ALJ may evaluate a non-treating source's opinion in light of other factors. *Id.; see also* 20 C.F.R. § 404.1527(d)(2)-(6). A treating source is a physician who provides (or has provided) a claimant with medical treatment or evaluation and has (or has had) an ongoing relationship with the claimant. 20 C.F.R. § 404.1502. A non-treating source is a physician who has examined the claimant but has not had an ongoing relationship with him or her. *Id.* An ongoing treatment relationship exists where the medical evidence establishes that

the claimant sees (or has seen) the physician with "a frequency consistent with acceptable medical practice for the type of treatment" required by the claimant's medical condition. *Id.*

Here, the medical evidence establishes that Claimant saw Dr. Ray only once. R. 1191. On October 26, 2007, Dr. Ray submitted a letter stating that he had seen Claimant as an inpatient when she was admitted to the hospital with an asthma exacerbation. *Id.* He stated that "her severe persistent asthma requires the use of multiple medications and steroids" and that "she has had multiple exacerbations despite use of medications." *Id.* Attached to this letter was the hospital report from Claimant's October 18, 2007 hospitalization, on which Dr. Ray noted that he had performed a history and physical examination of Claimant and spoken with the pulmonary resident who initially examined and treated her. *Id.* He also stated his agreement with the resident's findings. *Id.* There is no other evidence in the record—nor does Claimant draw the Court's attention to any other evidence—that Dr. Ray ever treated or examined Claimant on any other occasion. Because he examined Claimant only once, Dr. Ray does not qualify as a treating physician, and his opinion is not entitled to any controlling weight.

Moreover, though the ALJ was not required to give Dr. Ray's report controlling weight, he did consider it, adopting the doctor's statement of how often Claimant had needed her nebulizer and inhaler in the preceding few months. R. 32. Though, as Claimant suggests, the ALJ did note that Dr. Ray imposed no specific limitations on activity, this in no way represents a minimizing of his opinion. Instead, it simply suggests that the ALJ failed to imply, from Dr. Ray's letter, the significant limitations on Claimant's ability to work that she felt should have been implied. This decision is a proper exercise of the ALJ's discretion. Indeed, the ALJ is "not required or . . . permitted to accept medical evidence [that] is refuted by other evidence"—let alone expected to imply medical findings of his own. *Simila*, 573 F.3d at 515.

Because the ALJ was not required to give Dr. Ray's opinion controlling weight and because he reasonably evaluated it in light of the other substantial evidence in the record, he did not err in his RFC determination.

### 4. The ALJ Was Not Required To Solicit Further Medical Evidence

In connection with her contention that the ALJ failed to give sufficient weight to Dr. Ray's opinion, Claimant also argues that the ALJ should have solicited further medical evidence in the form of a clarification from Dr. Ray regarding the sort of limitations he would suggest placing upon her activity. Claimant's Br. [Dkt.#18], at 12-13. Additionally, Claimant contends that the ALJ erred by not requiring a medical expert to testify at the hearing. *Id.* at 13.

An ALJ has a duty to solicit additional information in order to "flesh out an opinion for which the medical support is not readily discernible." *Simila*, 573 F.3d at 516; *see also* 20 C.F.R. § 404.1527(c)(3). This means that an ALJ should "contact treating physicians for further information when the information already in the record is 'inadequate' to make a determination of disability." *Simila*, 573 F.3d at 516 (quoting *Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007)). In *Simila*, the court held that the ALJ was not required to re-contact a medical source when he or she rejected that source's opinion on the basis of other substantial evidence in the record.

Here, the evidence already in the record was more than adequate to make a determination of disability. The ALJ examined and considered all of Claimant's hospital records, the RFC assessments done by the agency, Dr. Desai's respiratory report, and the agency reviewing physician's report. He also questioned Claimant at length and adjusted his RFC determination in response to her testimony. Moreover, the ALJ did not reject Dr. Ray's opinion but accepted it—noting that it provided no evidence that Claimant was incapable of performing sedentary work.

An ALJ is required to call upon a medical expert ("ME") if doing so is "necessary to provide an informed basis for determining whether the claimant is disabled." *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000). In *Green*, for example, the court found that the ALJ should have summoned a ME when he completely discredited a claimant's testimony regarding his chest pain and determined that the claimant, who had emphysema and claimed to be unable to walk a block without panting, could perform medium work. 204 F.3d at 782.

This case is distinguishable from *Green* in two respects. First, there was sufficient evidence in the medical record to provide an informed basis for determining whether Claimant was disabled: the record contained all of Claimant's hospital records from childhood forward, none of which indicated that she lacked the ability to perform sedentary work under the restrictions identified by the ALJ. Second, the ALJ in Claimant's case entirely credited her testimony. He did not, as did the ALJ in *Green*, "play doctor" by rejecting Claimant's testimony about her limitations and relying on unclear medical records to support his decision. Instead, the ALJ in this case considered a complete record and made a determination amply supported by that record, including Claimant's testimony. Thus, he was not required to summon a ME.

Because the evidence in the record was more than adequate to make a determination of disability and also provided an informed basis upon which the ALJ determined that Claimant was not disabled, the ALJ did not err in failing to solicit further medical evidence.

### 5. The ALJ's Credibility Finding Was Not Patently Wrong

When faced with a claimant alleging subjective symptoms, an ALJ must evaluate the credibility of a claimant's testimony about her symptoms. SSR 96-7p. The ALJ must consider the testimony in light of the entire record and be "sufficiently specific" as to the reasons for his credibility determination. *Id.* Since the ALJ is in the best position to observe witnesses, his

credibility finding will not be overturned as long as it has some support in the record. *Dixon v. Massanari*, 270 F.3d 1171, 1178-79 (7th Cir. 2001). An ALJ's credibility determination will be reversed only if the claimant can show that it was "patently wrong." *Herr v. Sullivan*, 912 F.2d 178, 182 (7th Cir. 1990).

Claimant argues that the ALJ failed to explain his reasons for discrediting her statements concerning the intensity, persistence, and limiting effects of her symptoms. Claimant's Br. [Dkt.#18], at 11. She suggests that the ALJ's decision is lacking in that it "failed to even minimally articulate which statement or statements . . . were not credible." *Id.* We disagree. In evaluating a claimant's credibility, it is not disputed that the ALJ must comply with SSR 96-7p and articulate his reasons for his credibility evaluations. *Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003). However, the ALJ need not list out the seven factors in his opinion.[3] Instead, the ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statement and the reasons for that weight." *Id.* (citation omitted).

Here, the ALJ concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible "to the extent they [were] inconsistent with" the RFC determination. R. 30. Thus, the reason why the ALJ did not articulate any specific incredible statements made by Claimant was because he actually decided to credit all of her testimony about her symptoms. Specifically, Claimant indicated that her symptoms did not

---

[3] Social Security Ruling 96-7p requires consideration of: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual has received for the relief of pain or other symptoms; (6) measures other than treatment, that the individual uses to relieve the pain or other symptoms; and (7) any other factors concerning the individual's functional limitations due to pain or other symptoms.

prevent her from sitting, testified that she could stand for at least 15 minutes before requiring a

break, and reported that although she had trouble carrying her 25 pound baby up stairs, she could

probably lift a box. R. 1248-49. The ALJ credited each of these statements by limiting

Claimant's RFC to sedentary work, with the further restriction that she be required to stand or

walk for no more than 15 continuous minutes and for only two hours in an eight-hour workday.

R. 28. Because the ALJ adjusted his RFC determination in response to Claimant's testimony,

there are no statements in the record that were inconsistent with his determination. In light of

this, the Court cannot say that the ALJ's judgment is "patently wrong."

**6.      The ALJ Reasonably Relied On The VE's Testimony**

Lastly, Claimant contends that the ALJ erred in relying upon the VE's testimony.

Claimant's Br. [Dkt.#18], at 14. She claims that this testimony was suspect because the

Dictionary of Occupational Titles ("DOT") is outdated and did not contain the specific job

description of "sorter of nuts and bolts" that the VE testified she could perform. *Id.* Claimant

also suggests that the VE did not appropriately state the basis for his estimates. *Id.* The

Commissioner responds that the ALJ is only required to ensure a VE's testimony is consistent

with the DOT and maintains that the ALJ has no duty to take issue with the DOT itself.

Commissioner's Br. [Dkt.#26], at 7-8.

At the fifth step of the familiar five-step sequential analysis, the SSA bears the burden of

demonstrating that work exists in significant numbers in the national economy that the claimant

can perform, given her RFC, age, education, and prior work experience. 20 C.F.R. § 416.912(g).

At this step, a VE's testimony is often critical. The VE, presented with Claimant's RFC through

the ALJ's hypothetical questions, testifies, on the basis of both his or her own experience and the

employment data available in the DOT, as to whether such work exists. *See* Nathaniel O.

Hubley, *The Untouchables: Why a Vocational Expert's Testimony in Social Security Disability Hearings Cannot Be Touched*, 43 Val. U. L. Rev. 353, 377 (2008). The DOT itself is a publication of the Department of Labor—last updated in 1991—which categorizes occupations based upon their content. *Id.* at 371.

In the Seventh Circuit, an ALJ has an affirmative duty to ensure that the VE's testimony is consistent with the DOT. *Reider v. Astrue*, No. 07 C 7271, 2008 WL 2745958 (N.D. Ill. July 11, 2008); *see also Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006). This duty is two-fold. First, the ALJ must ask the VE if the evidence he or she has provided conflicts with the DOT. *Prochaska*, 454 F.3d at 735. Then, if the VE's evidence actually appears to conflict with the DOT, the ALJ must elicit a "reasonable explanation for the apparent conflict." *Id.*; *see also* SSR 00-4p. If the first part of the duty is met, the ALJ need not further inquire into specific characteristics of the jobs listed by the VE unless the testimony presents an apparent conflict with the DOT. *Stark v. Astrue*, 278 F. App'x 661, 667 (7th Cir. 2008).

Here, as the Commissioner notes, Claimant falters in effectively raising a SSR 00-4p or *Prochaska* challenge to the VE's testimony. Commissioner's Br. [Dkt.#26], at 7. Rather than challenging the alignment between the VE's testimony and the data in the DOT, Claimant seems to take issue with the DOT itself. However, because Claimant contends that the VE testified about an available position of "sorter of nuts and bolts" that was absent from the DOT, she is essentially arguing a lack of consistency. As such, her contention is properly submitted to a SSR 00-4p analysis.

In this case, the ALJ met the first SSR 00-4p requirement by explicitly asking the VE if the jobs he had spoken about were "within the characteristics of those types of jobs as noted in the DOT." R. 1256. Thus, the salient question becomes whether the ALJ was further required to

solicit an explanation for an apparent conflict between the DOT and the VE's testimony. *See Reider*, 2008 WL 2745958, at *12.

This case is analogous to *Stark*, in which the Claimant argued that the VE's testimony presented an apparent conflict because the VE testified to "broad categories" that did not reflect the "specific occupations listed in the DOT." 278 F. App'x at 667. Similarly, the Claimant here takes issue with the fact that the VE described the sorter position as "sorting nuts and bolts," when, according to her, the DOT only contains listings for sorters of buttons and notions or jewelry and silver. Claimant's Br. [Dkt.#18], at14. Just as in *Stark*, this divergence is a trivial one that did not trigger the ALJ's duty to inquire further.

Further clarification is provided by an examination of *Prochaska*. There, the court found that the ALJ failed to meet the first step because he did not inquire about the consistency between the VE's testimony and the DOT. *Prochaska*, 454 F.3d at 736. The court then remanded the case, expressing concern as to whether the jobs about which the VE testified actually (as defined in the DOT) required "specific physical capabilities . . . beyond [the claimant's] limitations." *Id.* In other words, the court remanded the case because it could not determine whether the ALJ's failure to probe any inconsistency between the VE's testimony and the DOT was harmless. By extension, it is clear that reversal or remand is not appropriate where any alleged inconsistency would not alter the conclusion that the claimant was capable of performing the position as outlined by the DOT. *See Reider*, 2008 WL 2745958, at *14 (noting that there was no conflict between the DOT and the VE's testimony where the "exertional requirements of the . . . job as outlined in the DOT [did] not exceed those outlined in plaintiff's RFC"). Because there is no difference in the level of exertion required by sorting nuts and bolts and sorting buttons—both jobs being identified as sedentary in nature—any failure on the ALJ's

behalf to probe an inconsistency amounts to harmless error. Moreover, although Claimant argues that the VE's failure to provide a DOT code number for the sorter position amounts to an inconsistency, "the lack of a DOT code does not, standing alone, signify . . . a conflict." *Id.*

Because there was no apparent conflict between the VE's testimony and the DOT, the ALJ satisfied his burden by asking the VE whether his testimony was consistent with the DOT. Having done so, he was not required to elicit any further information about the provenance of the VE's figures and was entitled to rely upon the VE's testimony in his decision. Furthermore, because Claimant demonstrates no meaningful inconsistency between the VE's testimony and the DOT, any failure on the ALJ's behalf to probe an inconsistency (though this Court does not imply there was one) was harmless.

## IV. CONCLUSION

For the reasons set forth in the Court's Memorandum Opinion and Order, Claimant Alexis Clanton's motion for summary judgment [Dkt.#18] is denied, the Commissioner's cross-motion for summary judgment [Dkt.#26] is granted, and the decision of the Commissioner is affirmed. This is a final appealable order.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: August 3, 2011